# IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

21-3346 & 21-3347

---

### UNITED STATES OF AMERICA,

Appellee,

v.

### EARL MCKEE,

Appellant.

---

*APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE*
*SOUTHERN DISTRICT OF IOWA*
*HONORABLE STEPHANIE ROSE, U.S. DISTRICT COURT JUDGE*

---

### APPELLANT'S BRIEF

---

**Nate Nieman**
Attorney at Law
329 18th St., Rock Island, IL 61201
Telephone: (309) 623-4831
Fax: (309) 517-5843
Email: nate@niemanlaw.com
AT0012958

ATTORNEY FOR APPELLANT

## SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

McKee appeals from the judgment of conviction and sentence entered against him on October 4, 2021, in the Southern District of Iowa, on a charge of felon in possession of a firearm. The District Court sentenced McKee to 120 months' imprisonment, to be followed by three years of supervised release. This sentence was ordered to run consecutive to a 24-month revocation sentence. McKee argues on appeal that the Government failed to prove beyond a reasonable doubt that he committed the offense of felon in possession of a firearm where the Government failed to prove that it was McKee, as opposed to someone else, who possessed the firearm in question.

McKee respectfully requests 10 minutes for oral argument.

Appellate Case: 21-3346    Page: 2    Date Filed: 01/11/2022 Entry ID: 5116161

# TABLE OF CONTENTS

SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT .........ii

TABLE OF AUTHORITIES ....................................................................iv

JURISDICTIONAL STATEMENT.......................................................1

STATEMENT OF THE ISSUE PRESENTED FOR REVIEW ...........................2

STATEMENT OF THE CASE .............................................................3

SUMMARY OF THE ARGUMENT……………………………………………27

ARGUMENT ..................................................................................28

**I.      The Government failed to prove beyond a reasonable doubt that McKee committed the offense of felon in possession of a firearm where it failed to prove that it was McKee, as opposed to someone else, who possessed the firearm in question**……………………………………………………………………………..28

CONCLUSION ...............................................................................36

CERTIFICATE OF FILING AND SERVICE.........................................37

Fed. R. App. P. 32(a)(7) AND 8th CIR. RULE 28A(c) CERTIFICATION……..39

iii.

# TABLE OF AUTHORITIES

**I. The Government failed to prove beyond a reasonable doubt that McKee committed the offense of felon in possession of a firearm where it failed to prove that it was McKee, as opposed to someone else, who possessed the firearm in question.**

## CASES

1. *United States v. Bell*, 761 F.3d 900 (8th Cir. 2014)…………………………...28,31

2. *United States v. Burning Breast*, 8 F.4th 808 (8th Cir. 2021)…………………..29

3. *United States v. Coleman*, 961 F.3d 1024 (8th Cir. 2020)………………………29

## STATUTES, RULES, GUIDELINES, OTHER AUTHORITIES

1. 18 U.S.C. § 922…………………………………………………………………29

iv.

# JURISDICTIONAL STATEMENT

*The decision appealed*: McKee appeals from the judgment of conviction and sentence entered against him on October 4, 2021, in the Southern District of Iowa, on a charge of felon in possession of a firearm. The District Court sentenced McKee to 120 months' imprisonment, to be followed by three years of supervised release. This sentence was ordered to run consecutive to a 24-month revocation sentence.

*Jurisdiction of the court below*: The United States District Court had jurisdiction over McKee's federal criminal prosecution pursuant to 18 U.S.C. § 3231 (2021) ("The district courts of the United States shall have original jurisdiction . . . of all offenses against the laws of the United States.").

*Jurisdiction of this court*: This Court has jurisdiction of the appeal pursuant to 28 U.S.C. § 1291 (2021) (the courts of appeals ". . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States . . . ").

The sentencing judgment and revocation judgment were entered on October 4, 2021. (R. Doc. at 79, pp. 2-3; R. Doc. (15) 91, pp. 2-3). McKee filed notices of appeal in both cases on October 17, 2021. (R. Doc. 83; R. Doc. (15) 94). McKee's notices of appeal were timely under Fed. R. App. P. 4(b)(4). Therefore, this Court has jurisdiction to hear this appeal under Fed. R. App. P. 4(b).

Appellate Case: 21-3346    Page: 5    Date Filed: 01/11/2022 Entry ID: 5116161

**STATEMENT OF THE ISSUE PRESENTED FOR REVIEW**

I.    **Whether the Government failed to prove beyond a reasonable doubt that McKee committed the offense of felon in possession of a firearm where it failed to prove that it was McKee, as opposed to someone else, who possessed the firearm in question.**

1. *United States v. Spight*, 817 F.3d 1099 (8th Cir. 2016)
2. *United States v. Henderson*, 11 F.4th 713 (8th Cir. 2021)
3. *United States v. Brooks*, 715 F.3d 1069 (8th Cir. 2013)

Appellate Case: 21-3346    Page: 6    Date Filed: 01/11/2022 Entry ID: 5116161

## STATEMENT OF THE CASE

*Nature of the Case*: McKee appeals from the judgment of conviction and sentence entered against him on October 4, 2021, in the Southern District of Iowa, on a charge of felon in possession of a firearm. The District Court sentenced McKee to 120 months' imprisonment, to be followed by three years of supervised release. This sentence was ordered to run consecutive to a 24-month revocation sentence.

*Factual and Procedural Background*: The Government charged Earl McKee by indictment with a single count of felon in possession of a firearm on October 7, 2020. (R. Doc. 2)[1]. McKee stood trial on the indictment before a jury on June 1, 2021. (Tr. at 1). There, the Government began by entering Government Exhibits 46 and 57. (Tr. at 28-29). Exhibit 46 established that the firearm met the federal definition of a firearm and was manufactured outside of the state of Iowa. (Tr. at 29). Exhibit 57 established McKee's prior felony conviction and his knowledge of it. (Tr. at 30).

---

[1] References to pleadings or orders filed in the District Court in 3:20-cr-00101 will be denoted throughout this brief by (R. Doc. [docket entry number], at [page number], [paragraph number (if applicable)]); references to the final PSR will be denoted throughout this brief by (PSR at [page or paragraph number, where applicable]); references to pages in the trial transcript will be denoted by (Plea Tr. at [page number]); references to pages in the sentencing hearing transcript will be denoted by (Sent. Tr. at [page number]). References to pleadings or orders filed in the District Court in 3:15-cr-00087 will be denoted throughout this brief by (R. Doc. (15) [docket entry number], at [page number]).

The Government then called Iowa City police officer James Sandifer, (Tr. at 31), who identified Exhibit 1 as an aerial view of the Town and Campus apartment complex. (Tr. at 33). Sandifer identified buildings H and P on the exhibit and explained that each building had multiple units in it. (Tr. at 35-36). The Iowa City Police Department responded to this apartment complex "at least ten times a day" for various reasons. (Tr. at 36). It was one of the highest crime apartment complexes in Iowa City. (Tr. at 36).

The apartment complex had several security cameras. (Tr. at 36). Sandifer identified Government's Exhibit 17 and 18 as aerial photographs of the apartment complex showing the camera angles for each camera. (Tr. at 37-38). The orange semicircles on Exhibit 18 showed cameras that were in place in August of 2020. (Tr. at 39). The purple semicircles showed cameras that were recently added. (Tr. at 39).

Sandifer was on duty at the University of Iowa Hospital on August 29, 2020 waiting for someone to pick up a dead body that had been delivered to the hospital. (Tr. at 40). While there, Sandifer learned that several people reported shots fired at Town and Campus. (Tr. at 40-41). Sandifer took out his cell phone and began reviewing live video feeds from the complex, to which he had remote access. (Tr. at 41). Sandifer learned that there had been a fight in front of H building. (Tr. at 43). Sandifer then watched Camera 11, which showed a gathering of people being

4

approached by a larger, heavyset male. (Tr. at 44). Commotion ensued and the group moved towards Arthur Street. (Tr. at 44).

Sandifer saw a subject wearing a long-sleeve shirt, skinny jeans, and long dreads run to the H building and up the stairs to apartment H6 on the second level. (Tr. at 44). The subject went into H6, came out "right away" with a large firearm resembling a rifle, went back down to the first level of the complex where the group had been, and took a firing stance. (Tr. at 44). The subject then ran back up to H6, went inside, left the firearm in the apartment, and then ran out of H6 in an eastward direction towards the P building. (R. 45-47). Camera 5 covered the middle courtyard section and camera 9 covered the stairwell of the P building. (Tr. at 48). Sandifer watched these cameras and observed the subject enter apartment P4, (Tr. at 48), which Sandifer shared with other officers over the radio. (Tr. at 48). The description of the person holding the firearm in front of H building matched the description of the person who entered P4. (Tr. at 49).

Sandifer identified Government's Exhibit 22 as a disc containing the camera footage from Town and Campus that evening. (Tr. at 49). Exhibit 23 contained footage from 12:00am to 12:02am that evening from channel 11 of one of those cameras. (Tr. at 49). Exhibit 24 contained footage from 12:01:02 to 12:02:09 from the same channel. (Tr. at 50). Exhibit 25 showed the same footage as Exhibit 24, but

5

at half-speed. (Tr. at 50). Exhibit 26 showed footage from channel 5 from 12:02:04 to 12:02:14. (Tr. at 50). Exhibit 27 showed the same footage at half-speed. (Tr. at 50). Exhibit 28 showed channel 9 from 12:02:09 to 12:02:27, and Exhibit 29 showed the same footage at half-speed. (Tr. at 50).

Sandifer testified that Exhibit 23 (showing camera 11) showed the stairwell to the H building. (Tr. at 52). The video also showed people standing in the doorway of H6 and a dispute occurring. (Tr. at 52). The video showed a person running up the stairs from a dark area around the corner to retrieve a gun from H6 and then run back down the stairs. (Tr. at 53). The shooter raised the gun, circled around, and then ran off. (Tr. at 54). Sandifer's identification of the subject was based on the subject's hair, which was in "very long dreads." (Tr. at 54, 57).

No shell casings were recovered from the bottom of the stairs, but shell casings were found in an area out of view of the camera. (Tr. at 54). There were no cameras showing the area where the shooting occurred. (Tr. at 54). Officers were able to determine that the intended target of the shooting was a man named James Joy. (Tr. at 56). Camera 5 (Exhibit 27) partially showed the area from building H to building P. (Tr. at 60). This camera showed a subject with long dreads. (Tr. at 62). Camera 9 (Exhibit 29) showed two men coming from west. (Tr. at 63). The video showed the suspected shooter going up the stairwell of the P building. (Tr. at 63).

6

Sandifer eventually left the hospital and went to the apartment complex. (Tr. at 64). Someone pointed out the shell casings to Sandifer as he arrived. (Tr. at 64). Sandifer then went to the security room located in one of the other apartment buildings and began reviewing footage. (Tr. at 64-65). Detectives decided to position officers by both H6 and P4. (Tr. at 65). Sandifer began reviewing footage from H6 and P4. (Tr. at 66). H6 was relevant to the investigation because that's where the firearm was located. (Tr. at 66). Sandifer reviewed footage from both sides of H6 and did not see anyone leave or exit with a firearm. (Tr. at 66). Government's Exhibit 21 was a photograph of the back of P4, which was on the second floor of the building. (Tr. at 68). Someone could have jumped out of the back of P4 and ran. (Tr. at 69). Sandifer testified that that did not happen between the time that the suspect entered P4 and the time Officer Kuntz arrived there to stand watch because the video did not show that. (Tr. at 69). Sandifer stopped watching the video from P4 when officers arrived there. (Tr. at 70).

A man named Devinity Reynolds lived in P4. (Tr. at 71). Sandifer determined that Reynolds was not the shooting suspect "Based on my interaction with him and my review of the video and coupled with my conversations with other officers." (Tr. at 71). Reynolds had a "buzz hair cut" and was taller than the suspected shooter,

Appellate Case: 21-3346    Page: 11    Date Filed: 01/11/2022 Entry ID: 5116161

which he knew based on "know[ing] the typical height of most place or things" around the apartment complex and the height of James Joy. (Tr. at 72).

Sandifer's colleagues obtained search warrants for H6 and P4. (Tr. at 73). Unit H6 belonged to Kendall Johnson, who Sandifer concluded could not be the shooter "based off his height, description, his hair, and his appearance that night compared to the shooter's." (Tr. at 73). Johnson had dreads, too, but he kept them in a French-brain on top of his head. (Tr. at 73). Sandifer heard Johnson tell another officer that the rifle could be located in the furnace room of H6. (Tr. at 74). Exhibit 13 showed a bedroom, where a magazine to a firearm was located. (Tr. at 76). In the furnace room, officers recovered a blue vinyl bag behind the water heater containing a firearm. (Tr. at 77). The firearm was difficult to reach, but Sandifer was able to pull it out from the blue bag. (Tr. at 78-80). Sandifer also located four loose rounds in the bag. (Tr. at 80). Sandifer handed the firearm to another officer after retrieving it from the bag. (Tr. at 81). One round was in the firearm. (Tr. at 81).

Sandfier had little involvement with the search of P4, but he observed the suspected shooter removed from the apartment. (Tr. at 83). Sandifer knew it was the shooter "based on my video review and the information that I had at the time that there was no other subject that had left that apartment." (Tr. at 83). The Iowa City Police Department was investigating the incident for over four hours. (Tr. at 83).

8

The search warrants weren't executed until 4am. (Tr. at 83). Just two people exited P4 during this time period—Reynolds and McKee. (Tr. at 84). McKee was removed from the apartment when he was taken into custody. (Tr. at 84). Sandifer observed McKee "One minute or so" after he had been taken into custody. (Tr. at 84). McKee's white shoes, "right fitting" pants, and white shirt were consistent with the shooter in the video. (Tr. at 84-85). McKee also had long dreads. (Tr. at 86). Sandifer provided an in-court identification of McKee as the person who was removed from P4 that evening. (Tr. at 86).

On cross-examination, Sandifer testified that there were sixteen buildings in the complex, each containing two floors of an unknown number of units. (Tr. at 105). Sandifer estimated that "Maybe 50" tenants lived in the complex. (Tr. at 106). The population of the complex was predominately black. (Tr. at 107). Sandifer confirmed that based on his prior estimate, he received 3,650 calls a year from the complex. (Tr. at 107). Sandifer received the dispatch about the shooting at the apartment complex "around midnight." (Tr. at 104). The shooting had already happened when he received the dispatch. (Tr. at 108).

The surveillance video that Sandifer was watching at the hospital started around midnight. (Tr. at 108-09). Activity in the video began at 12:01am. (Tr. at 109). A man ran from a group of people up to H6. (Tr. at 109). The H6 unit was one

9

unit in a building among fifteen other buildings. (Tr. at 109). The man grabbed a gun from H6, ran downstairs, assumed a firing position where the crowd had been at the bottom of the stairs, ran across the courtyard to a gangway area, and shot the gun towards another person. (Tr. at 109). The crowd then took off in all directions. (Tr. at 110).

At 12:01:40, the shooter ran back up to H6, and placed the gun inside the doorway. (Tr. at 110). Sandifer had noted in his police report that as the shooter was placing the gun into H6, another male in a white shirt, jean pants, and white sneakers ran into H6 with a pistol in his hand, (Tr. at 111), though Sandifer later determined that it was not a pistol. (Tr. at 112). As that man ran into H6, several individuals ran in and out of H6. (Tr. at 112). A number of these people ran into H6 as the shooter was shooting the rifle. (Tr. at 114). One person walked into H6 before the shooter came in and one person walked into H6 after the shooter came in. (Tr. at 114). Two people ran out of H6, followed by eight more people who went off in different directions. (Tr. at 115). Someone stood in the doorway after all of the people ran out of it. (Tr. at 115).

Two men ran towards apartment P4 and one man ran into apartment O1, which was right next to the P building. (Tr. at 116). The O building, like the P building, was partially covered by video. (Tr. at 116). It only took 40 seconds from

10

the time that the man ran up the stairs to H6 to the time that he returned to H6 after firing the gun. (Tr. at 117). Another man in a white shirt ran through the south lot towards Wayne Avenue. (Tr. at 118). Three other men got into a Ford 500 and drove northbound on Muscatine Avenue. (Tr. at 118). Two other men walked through the north lot on foot. (Tr. at 118). All eight men who fled H6 were black. (Tr. at 119). Sandifer didn't know if any of them had dreadlocks. (Tr. at 119). Sandifer believed that several of them were wearing white shirts. (Tr. at 119).

Sandifer saw a man enter P4 at approximately 12:02:30. (Tr. at 119). Sandifer's identification of the shooter was based on "His descriptions, physical appearance and clothing description" as seen in the video. (Tr. at 120). The east stairwell to the P building was not on video. (Tr. at 121). Sandifer estimated that the distance between the stairwells of the H and the P buildings was approximately 100 yards. (Tr. at 121). Sandifer did not know if anyone else had gone into P4 during this time other than the suspect. (Tr. at 124). Sandifer's basis for believing that nobody came in or out of P4 at this time was based on his review of the video. (Tr. at 124). The balcony on P4 was about 10 to 12 feet off the ground. (Tr. at 124). Someone could have jumped off it without killing themselves. (Tr. at 124). When officers arrived, they did not immediately establish a perimeter around P4. (Tr. at 126).

11

Sandifer left the apartment complex for the police department because Devinity Reynolds was in custody there. (Tr. at 128-29). Other officers were preparing search warrants, which were signed at around 4:00am. (Tr. at 130). Sandifer went back to the complex, executing the first search warrant at H6, which was the home of Kendall Johnson. (Tr. at 130-31). Johnson, like Reynolds, was also black. (Tr. at 131). He was a little taller than Sandifer and had "short dreads that he usually keeps in a braided fashion on his head." (Tr. at 131). Sandifer participated in the search warrant execution at H6. (Tr. at 131). To get to the furnace closet where the gun was found, one would have to walk through the dining room, down a hallway, and past several doors. (Tr. at 132). The furnace closet where the gun was found was at the back of the apartment. (Tr. at 132). The furnace closet was dark and the gun was not easily visible. (Tr. at 133). The gun was hidden in a blue cooler bag in the room. (Tr. at 133).

Sandifer went over to P4 after retrieving the gun from H6. (Tr. at 134). Sandifer helped search the apartment but found nothing and cleared the scene. (Tr. at 134). McKee was in the apartment. (Tr. at 134). Later in the day, police located the Ford 500 that Sandifer had seen three men getting into on video. (Tr. at 135). When Sandifer located the Ford 500, only two males were in it. (Tr. at 136). Sandifer did not know their names because the men refused to give them. (Tr. at 136). The

12

men were black, but Sandifer did not recall their hairstyles. (Tr. at 136). Sandifer indicated that two or three people running out of the apartment complex were wearing white shirts. (Tr. at 139). Several were wearing white shoes. (Tr. at 139). Sandifer said that it was "probably" common to see individuals with jeans, white shirts, and white shoes at this complex. (Tr. at 139). Sandifer had also seen other men with dreadlocks at that apartment complex. (Tr. at 139).

On re-cross, Sandifer testified that there were a number of places in the apartment complex that would not be shown on video. (Tr. at 154-55). There was no footage showing the discharge of the firearm. (Tr. at 155). Sandifer watched video from all thirty surveillance cameras, watching multiple videos at a time. (Tr. at 156). Sandifer's attention was divided. (Tr. at 156). Sandifer saw Reynolds walking over to H6 shortly after the shooting. (Tr. at 156-57).

The Government next called Officer Mark Schaapveld of the Iowa City Police Department. (Tr. at 158-59). Schaapveld was on patrol on August 30th. (Tr. at 159-60). He was dispatched to Town and Campus apartments at about 12:05 for a shots fired call. (Tr. at 160). When he arrived, other officers were canvassing for shell casings, so he helped out. (Tr. at 160). Schaapveld found ten shell casings, marked them, and took pictures of them. (Tr. at 161-62). Schaapveld watched the front door of H6. (Tr. at 165). Nothing happened at H6, but Schaapveld heard on the radio that

13

a male was coming out of P4, so he headed over to P4 to assist. (Tr. at 165-66). Other officers continued to watch H6. (Tr. at 166). Schaapveld watched P4 as they took a person out, placed him in custody, and took him away in a squad car. (Tr. at 166). Schaapveld continued watching the front door of P4 while officers awaited a search warrant. (Tr. at 166-67).

Once the search warrant was signed, Schaapveld helped search P4. (Tr. at 167). Some of the officers who had executed a search warrant on H6 came over to help execute the search warrant on P4. (Tr. at 167). Schaapveld knocked on the door to P4 but nobody answered. The door was unlocked, so he opened it and announced his presence. (Tr. at 168). McKee announced that he was coming out. McKee then exited the apartment, was handcuffed, and taken into custody. (Tr. at 169). No illegal items were on McKee's person. (Tr. at 169). No other people or weapons were found in P4. (Tr. at 169). Exhibit 53 showed what McKee was wearing when he was taken to the police department. (Tr. at 174). McKee was wearing a multicolored zip-up hoodie, jeans, and white shoes in Government Exhibit 52. (Tr. at 175-76).

Officer Daniel Boesen of the Iowa City Police Department testified that he was on patrol when he responded to Town and Campus for a shots fired call. (Tr. at 179). Boesen was one of the first officers to respond. (Tr. at 179). Boesen began talking to witnesses and then went to apartment H3, which was right below H6, and

14

spoke with resident Priscilla Booker. (Tr. at 180). Boesen then spoke with other officers who had located shell casings. (Tr. at 181). Boesen was involved in finding a cluster of shell casings. (Tr. at 182). Boesen assisted in the collection and securing of the evidence. (Tr. at 182). Boesen then went to P4 to secure the area and stood guard in front of P4. (Tr. at 185-86). Officer Kunz was on the side of P4. (Tr. at 186).

Devinity Reynolds, as resident of P4, came from another part of the complex towards P4. (Tr. at 186-87). Boesen spoke to Reynolds, and then Reynolds entered P4. (Tr. at 187). Boesen then received directives that anyone coming into or out of P4 or H6 should be detained. (Tr. at 187). Reynolds was in the apartment, and another person could be seen through the window on the backside of the apartment, but his identity was unknown. (Tr. at 187). Reynolds exited the apartment and Boesen detained him. (Tr. at 188). Officer McNamee watched the front of P4 while Boesen took Reynolds to the police station. (Tr. at 189). It was Boesen's understanding that other officers like Officer Kuntz were watching the back of P4. (Tr. at 189). Reynolds was wearing darker shoes, white pants, and a white shirt. (Tr. at 191). Reynolds had short-cropped hair. (Tr. at 191).

On cross-examination, Boesen acknowledged that he knew "in a roundabout way" that Reynolds was involved in the shooting incident when he entered P4. (Tr. at 195). Reynolds identified himself to Boesen as the sole occupant of that apartment.

(Tr. at 196). When Boesen let Reynolds into P4, officers "were not securing P4," but were merely over by P4. (Tr. at 197). Nobody was at P4 until 12:40am. Anyone could have come and gone from P4 during that time. (Tr. at 198). Reynolds' apartment was unlocked. (Tr. at 198). Reynolds came out of the apartment at 2:52am. (Tr. at 198). Boesen did not know who was in the apartment other than Reynolds. (Tr. at 198).

Officer Jonah Kuntz of the Iowa City Police Department testified that he was dispatched to the Town and Campus complex on August 30th. (Tr. at 204). Kuntz arrived there 15 minutes after he received the dispatch. (Tr. at 204). Other officers were already there, marking shell casings on the ground. (Tr. at 205). Kuntz then walked with Boesen to P4. (Tr. at 206). Kuntz then watched the back of P4 to see if anyone left or entered the apartment. (Tr. at 206). Kuntz only saw a tv turn on inside the apartment. (Tr. at 207). The shades were drawn on the door. (Tr. at 207). When Kuntz heard that there was activity at the entrance of P4, he walked to the front of the apartment. (Tr. at 208). Boesen made contact with a suspect who had come out of P4. (Tr. at 209). Boesen learned that this was Reynolds. (Tr. at 209). Boesen stayed in the front of P4 for the rest of the time he was there. Officer McNamee was watching the back. (Tr. at 209). Nobody had come out of the back door of P4 when

16

he was watching it and nobody came out of the front door while he was securing it. (Tr. at 210).

Kuntz assisted in the search warrant for P4 after it was obtained. Kuntz walked to the back of the apartment with McNamee to see if anyone would jump out when the search was conducted. (Tr. at 210). When contact was made with the suspect, he walked to the front of the apartment to clear help clear it for safety. (Tr. at 210). After McKee came out of the apartment, Schaapveld took him into custody and Kuntz went into the apartment to make sure no other people were in there. (Tr. at 210-11). None were found inside. (Tr. at 211). Kuntz then resumed patrol after ensuring that he was no longer needed there. (Tr. at 211). On cross-examination, Kuntz testified that he arrived at the apartment complex around 12:20am. (Tr. at 212). He went to P4 approximately thirty minutes after arriving. (Tr. at 212). No other officers were at P4 when he arrived. Boesen followed him to P4. (Tr. at 213).

Officer Isaiah McNamee of the Iowa City Police Department testified that he was one his way home from his shift when he was called to respond to Town and Campus. (Tr. at 217). Other officers were already there when he arrived so he began canvassing for shell casings. (Tr. at 217). McNamee then spoke with Kendall Johnson of apartment H6 before going over to P4 to assist two other officers with watching it. (Tr. at 217-18). McNamee arrived at P4 at about 1:30am. (Tr. at 218).

17

Boesen and Kuntz were already there. (Tr. at 218). Boesen was watching the front of the apartment while Kuntz was watching the back. (Tr. at 218). McNamee parked on the east side of the complex so that he could charge his body camera and watch the back of P4 while Boesen watched the front. (Tr. at 218). From his car, McNamee could see both Kuntz and Boesen watching the front and back of the apartment. (Tr. at 219). Kuntz and Boesen were in those positions then entire time he was there. (Tr. at 219). Once McNamee's camera was charged, he left his car to stand between Kuntz and Boesen on the second level of the complex. (Tr. at 219).

Reynolds eventually exited the front of P4. (Tr. at 220). McNamee watched the back of the apartment when Boesen transported Reynolds to the police station. (Tr. at 220). Kuntz then replaced Boesen at the front of P4, as McNamee replaced Kuntz at the back. (Tr. at 220). McNamee stayed at the back of the apartment until the search warrant was executed. (Tr. at 220). McNamee did not observe anyone exit P4 while he was in his car, nor did he see anyone leave the back of the apartment while he stood watch. (Tr. at 221). Reynolds was the only person who he saw exit the apartment. (Tr. at 221). On cross-examination, McNamee indicated that Kendell Johnson told him that he owned an assault rifle. (Tr. at 222).

James Joy testified that he was currently in the custody of the Johnson County Sheriff pending charges, some of which were felonies. (Tr. at 226). Joy was also

18

facing a probation revocation. (Tr. at 227). Joy was at Town and Campus just after midnight on August 30, 2020. (Tr. at 229). Joy was dropped off at Kum & Go three or four blocks away from the apartment complex. (Tr. at 229). Joy walked over to the complex to "kick it" with some people he knew over there. (Tr. at 229-30). Joy was approached by "Chris and Reece" about the stabbing incident that he was on probation for. (Tr. at 231-32). These people wondered why Joy was there. (Tr. at 231). The men were mad about the stabbing incident. (Tr. at 232). Joy did not see the men with any firearms, but he was concerned that they had them because they were known to carry firearms. (Tr. at 233).

Joy saw a person who was barbecuing and asked him if he could have some food. (Tr. at 233). Then, as Joy sat down, he saw "Chris and them over there talking" and a person run past him up the stairs. (Tr. at 234). Joy did not know the person. (Tr. at 235). The person running up the stairs was running towards "Kels." (Tr. at 236). Kels passed the man something that looked like a pole. (Tr. at 237). Joy realized that the pole was a gun when the man got to the bottom of the stairs. (Tr. at 238). Joy described the gun as "like a small handgun" that was smaller than an assault rifle. (Tr. at 238). The man raised the gun at Joy, who looked both ways and then ran between the stairs towards the bank, through a cemetery, and to another apartment complex. (Tr. at 239).

19

On cross-examination, Joy indicated that he was in the hospital on September 23, 2020 after getting hurt while fleeing from police. (Tr. at 241-42). Joy remembered talking to Detective Jacob Belay there about this shooting. (Tr. at 242). Joy told Belay that the shooter's name was Twan, but he was lying. (Tr. at 242). Joy told Belay that Twan was a short black male with a chipped tooth. (Tr. at 243). But at trial, Joy was now saying that McKee had shot at him. (Tr. at 244). McKee does not have any chipped teeth. (Tr. at 244). Joy told Belay that Twan had a black handgun with a wooden handle and a silver piece on top. (Tr. at 244). Joy also told Belay that there were two other males with Twan—a skinny black male and a short black male. (Tr. at 245). Joy was now facing twelve or thirteen charges but was facing more than that when he was interviewed by Belay. (Tr. at 246). Joy did not recall if he had ever told anyone that McKee shot at him prior to this trial. (Tr. at 247-48). Joy maintained that he had "pretty much" never been asked who shot him prior to the trial. (Tr. at 249).

Officer Conner Herman of the Iowa City Police Department testified that he was dispatched to a shots fired calls at Town and Campus apartments on August 30, 2020. (Tr. at 254). Other officers were on scene when he arrived. (Tr. at 255). Prior to arriving to the complex, Herman stopped two individuals who were walking away from it. (Tr. at 255). Another officer was already speaking with them. (Tr. at 255).

Herman then went to Town and Campus and assisted with searching for shell casings. (Tr. at 255). Herman was then assigned to maintain a perimeter around H6. (Tr. at 256). Herman watched the front and back of the apartment. (Tr. at 256). Three individuals went into H6 while he was watching it—Johnson, Reynolds, and a female with the last name of Yoder. (Tr. at 257). They were allowed to go into H6. (Tr. at 257).

Herman allowed Reynolds to go into the apartment, but when Reynolds left, Herman patted him down for weapons and found none. (Tr. at 258). Herman watched H6 for several more hours. (Tr. at 258). No other people came out of the apartment during that time. (Tr. at 258). Herman participated in the execution of the search warrant on H6. (Tr. at 258). Two people were in H6 while the search warrant was being executed—Johnson and Yoder. (Tr. at 259). Officer Sandifer recovered a firearm in a furnace room of the apartment. (Tr. at 259). Herman made the firearm safe. (Tr. at 260). There was no magazine in the firearm, but there was one found elsewhere in the apartment. (Tr. at 260). Herman then helped execute the search warrant at P4. (Tr. at 261). One person was in the apartment. (Tr. at 261). Herman went into the apartment after that person came out. (Tr. at 261). Herman identified the person in the apartment as McKee. (Tr. at 261). No other people or guns were found in the apartment. (Tr. at 262).

Appellate Case: 21-3346    Page: 25    Date Filed: 01/11/2022 Entry ID: 5116161

Detective Traishondus Bunch of the Iowa City Police Department testified that he was a patrol officer on August 30, 2020 when he was dispatched to Town and Campus for a weapons offense. (Tr. at 269-70). Bunch arrived at the complex at 12:07am. (Tr. at 270). Other officers were already on scene. (Tr. at 271). Bunch made contact with Kendall Johnson, who was grilling food by the staircase. (Tr. at 271). Bunch then canvased the area for shell casings and then watched surveillance video. (Tr. at 272). Bunch watched video from nearly midnight to the time when officers arrived. (Tr. at 274). Bunch saw McKee go into P4 but did not see anyone else enter. (Tr. at 274). Bunch watched the video until officers set up a perimeter on P4. (Tr. at 274). While watching the video, Bunch observed Reynolds exit P4. (Tr. at 275). While he was watching the video, he was watching multiple camera views. (Tr. at 276). There were times when Bunch did not watch the video in real time. He didn't stay in the video room for hours to watch it. (Tr. at 276). There were also times that he sped the video up. (Tr. at 278).

Reynolds came out of P4 when officers had a perimeter on it. (Tr. at 276). Reynolds was detained. (Tr. at 277). The search warrant was signed at 4:14am. (Tr. at 277). Bunch went back to complex, starting with H6. (Tr. at 277). The search warrant was executed on H6. Kendall Johnson and Dayanna Yoder were inside. (Tr. at 277). A gun was found in the furnace room with a single bullet in it. (Tr. at 277).

22

A magazine was found in the bedroom. (Tr. at 277). Bunch then assisted with the execution of the search warrant on P4. (Tr. at 278). McKee was already in custody. (Tr. at 278). Bunch found a dark-colored jacket with McKee's driver's license in it in P4. (Tr. at 278).

On cross-examination, Bunch indicated that he wrote in his report that Johnson's story was very shaky. Johnson was nervous and stressed out. (Tr. at 282). While Bunch was talking to Johnson, Alando Gordon and Devinity Reynolds went in and out of Johnson's apartment. (Tr. at 283-84).

Officer Alex Stricker of the Iowa City Police Department testified that he did not go to the scene but processed some of the evidence. (Tr. at 288). Stricker first took photographs of the firearm, swabbed it for DNA, and then sent to the swabs to the crime lab. (Tr. at 289-90). The lab determined that swabs from the rear grip, magazine safety, and trigger contained a mixture of DNA from four people. (Tr. at 291). The other swab contained a mixture of DNA from three people. (Tr. at 291).

Stricker then tried to locate fingerprints on the firearm. (Tr. at 292). Stricker found prints on the firearm in two areas and sent those to a different crime lab. (Tr. at 292-93). There was one print that was good enough for comparison, but there was no match. (Tr. at 294). Stricker then sent the firearm and casings to the DCI laboratory to determine whether the casings located came from the firearm. (Tr. at

295). The results showed that the casings came from the firearm. (Tr. at 297). Stricker indicated that the Iowa City Police Department did not have the equipment to test for gunshot residue so this test was not conducted. (Tr. at 298). Stricker testified on cross-examination that up to seven people's DNA could have been on the firearm. (Tr. at 302-03).

Detective Matt Ties of the Iowa City Police Department testified that he was on duty the night of the shooting when he responded to the Town and Campus apartments around 12:15 or 12:20am. (Tr. at 310-11). Ties reviewed surveillance video footage with Sandifer and Bunch at Town and Campus. (Tr. at 312). Ties reviewed video from the front of H and P buildings. (Tr. at 313). Ties testified that based on his review of the video, the shooter would not have enough time to deposit the firearm where Sandifer had located it within H6. (Tr. at 315).

Ties concluded that H6 and P4 needed to be secured because the gun was in H6 and the suspected shooter went into P4. (Tr. at 317-18). Ties sent officers to each of those apartments. (Tr. at 318). Ties did not want the firearm to leave H6 while the search warrants were being obtained. (Tr. at 318). It was less concerning to him whether anyone went into the apartment. (Tr. at 319). Ties was also concerned with anyone leaving P4. (Tr. at 319). Ties was less concerned with someone going in that apartment. (Tr. at 319).

24

Ties began watching surveillance video beginning at 11:45pm. (Tr. at 323). Both Alando Gordon and Chris Gordon were on video. (Tr. at 323-24). Ties also saw Kendall Johnson on the video. (Tr. at 324). Johnson and Alando were grilling by the bottom of the stairs. (Tr. at 324). Ties had watched over a dozen hours of video. (Tr. at 327). More than eight people left H6 after the gun was returned to it following the shooting. (Tr. at 328). Ties eliminated all but one of those people—McKee—as the person in possession of the firearm. (Tr. at 333). Ties testified on cross-examination that he was unaware of any other time that Joy identified McKee as the shooter. (Tr. at 354).

The Government rested. (Tr. at 360). McKee made a motion for acquittal, which was denied. (Tr. at 361). McKee choose not to testify, (Tr. at 364), did not present any evidence, and then rested. (Tr. at 371). The jury found McKee guilty of the single count in the indictment. (Tr. at 420; R. Doc. at 57).

Probation determined that McKee's base offense level was 33 based on the attempted murder cross reference under U.S.S.G. § 2K1.1(c)(1)(A), U.S.S.G. § 2X1.1, and U.S.S.G. § 2A2.1. (R. Doc. at 71, p. 8, par. 27). Where no other adjustments applied, McKee's total offense level was 33. (R. Doc. at 71, p. 8, par. 35). Probation determined that McKee was a criminal history category V, (R. Doc. at 71, p. 13, par. 48), which, combined with an offense level of 33, resulted in a

25

guideline imprisonment range of 210-to-262 months. (R. Doc. at 71, p. 23, par. 115). McKee objected to the application of the attempted murder cross reference. (R. Doc. at 74, pp. 1-2). The Government did not object to the PSR. (R. Doc. 72). Probation did not sustain McKee's objections. (PSR at 36-37). The guideline imprisonment range in the final PSR remained the same. (PSR at ¶ 115).

Prior to the indictment being filed in 3:20-cr-00101, the McKee had been serving a term of supervised release in 3:15-cr-00087. (R. Doc. (15) 68, p. 1). The Government filed a petition to revoke McKee's supervised release on May 15, 2020, alleging that McKee violated his supervised release by possessing a danger weapon and failing to report for a UA. (R. Doc. (15) 68, p. 1). An addendum to was later filed adding a new violation of possession of a firearm in connection with the August 30, 2020 shooting incident on which the indictment in 3:20-cr-00101 was based. (R. Doc. (15) 78). A second addendum was filed consolidating the three violations. (R. Doc. (15) 88, p. 1-2). Where the new law violation was a grade B violation and McKee was a category IV when he was originally sentenced, McKee's guideline imprisonment range on the revocation was 12-to-18 months. (R. Doc. (15) 90, pp. 1-2).

The District Court addressed sentencing in 3:20-cr-00101 and the revocation in 3:15-cr-00087 on October 4, 2021. (Sent. Tr. at 1). The Court found that the attempted murder cross-reference applied, (Sent. Tr. at 7), noting that even if it

26

didn't, McKee's guideline imprisonment range would still exceed the statutory maximum. (Sent. Tr. at 5, 8). The Court then took up the revocation matter. (Sent. Tr. at 9). McKee admitted to the violations as outlined in the second addendum, and the Court revoked McKee's supervised release. (Sent. Tr. at 13). The Court adopted Probation's guideline range of 12-to-18 months. (Sent. Tr. at 13).

The Court sentenced McKee to 120 months' BOP, to be followed by three years of supervised release in 3:20-cr-00101. (Sent. Tr. at 27-28). The Court sentenced McKee to a consecutive term of 24 months' BOP in 3:15-cr-00087, with no term of supervision to follow. (Sent. Tr. at 27-28). Written judgments to this effect were entered on October 4, 2021. (R. Doc. at 79, pp. 2-3; R. Doc. (15) 91, pp. 2-3). Timely notices of appeal were filed in both cases on October 17, 2021. (R. Doc. 83; R. Doc. (15) 94).

## SUMMARY OF THE ARGUMENT

The Government failed to prove beyond a reasonable doubt that McKee committed the offense of felon in possession of a firearm where it failed to prove that it was McKee, as opposed to someone else, who possessed the firearm in question. The Government did not prove that McKee ever left P4 to shoot at James Joy in front of the H building. The Government's case hinged on proving that P4 was surveilled from moment that the shooter entered P4 to the moment that McKee was

27

found within the apartment, but it wasn't. Furthermore, McKee could not have been identified from the surveillance video because he was wearing similar clothes and a similar hairstyle to several other black men who were present at the shooting scene that night. Lastly, James Joy's identification of McKee should be disregarded because he had previously identified someone else as the shooter and then switched his story at trial. The Government's evidence failed to prove McKee guilty beyond a reasonable doubt. McKee's conviction and sentence should be reversed.

## ARGUMENT

**I.** **The Government failed to prove beyond a reasonable doubt that McKee committed the offense of felon in possession of a firearm where it failed to prove that it was McKee, as opposed to someone else, who possessed the firearm in question.**

*Standard of Review*: McKee argues here that the Government failed to prove beyond a reasonable doubt at trial that he possessed the firearm in question. This court reviews "*de novo* the sufficiency of the evidence to sustain a conviction, viewing the evidence in a light most favorable to the verdict and accepting all reasonable inferences supporting the verdict." *United States v. Bell*, 761 F.3d 900, 906–07 (8th Cir. 2014). Furthermore, this court will overturn McKee's conviction "only if no reasonable jury could have found him guilty beyond a reasonable doubt." *Id*. The standard of review for sufficiency-of-the-evidence challenges is strict. *Id*. at

907. This court will "consider the same quantum of evidence that was presented at trial, even if some of the evidence was improperly admitted." *Id*.

*Merits*: In order to be convicted of being a felon in possession of a firearm, the government must prove beyond a reasonable doubt that (1) Mckee had been previously convicted of a crime punishable by a term of imprisonment exceeding one year; (2) Mckee knowingly possessed a firearm; (3) the firearm was in or affecting interstate commerce; and (4) Mckee "knew he belonged to the relevant category of persons barred from possessing a firearm." *United States v. Burning Breast*, 8 F.4th 808, 812 (8th Cir. 2021) (citing *United States v. Coleman*, 961 F.3d 1024, 1027 (8th Cir. 2020); 18 U.S.C. § 922(g)). McKee argues here that Government failed to prove beyond a reasonable doubt at trial that it was McKee, as opposed to someone else, who possessed the rifle used in the shooting at the Town and Campus apartments.

The Government established at trial that just after midnight on August 30, 2020 James Joy got into a dispute with someone at Town and Campus apartments in Iowa City. (Tr. at 52). Setting aside Joy's testimony for a moment, the objective video surveillance footage admitted at trial showed that at approximately 12:01am, (Tr. at 109), a man ran from a group of people up to apartment H6. (Tr. at 109). The man grabbed a gun from H6, ran downstairs, assumed a firing position where the crowd had been at the bottom of the stairs, ran across the courtyard to a gangway

29

area, and shot the gun towards another person, (Tr. at 109), who officers later learned was Joy. (Tr. at 56). The crowd then took off in all directions. (Tr. at 110). At 12:01:40, the shooter ran back up to H6, and placed the gun inside the doorway. (Tr. at 110).

As the shooter was placing the gun into H6, another male in a white shirt, jean pants, and white sneakers ran into H6 with what Sandifer thought was a pistol in his hand. (Tr. at 111). As that man ran into H6, a number of individuals ran in and out of H6. (Tr. at 112). Two people ran out of H6, followed by eight more people who went off in different directions. (Tr. at 115). A man in a white shirt ran through the south lot towards Wayne Avenue. (Tr. at 118). Three other men got into a Ford 500 and drove northbound on Muscatine Avenue. (Tr. at 118). Two other men walked through the north lot on foot. (Tr. at 118).

Camera 5 (Exhibit 27) partially showed the area from building H to building P. (Tr. at 60). The video from that camera showed two men run towards apartment P4 and one man ran into apartment O1, which was right next to the P building. (Tr. at 116). The video showed the suspected shooter going up the stairwell of the P building. (Tr. at 63). The suspect then entered apartment P4 at approximately 12:02:30. (Tr. at 119). Sandifer's colleagues obtained search warrants for H6 and P4, (Tr. at 73), but the search warrants weren't executed until 4am. (Tr. at 83). When

30

the search warrant was executed on P4, McKee then exited the apartment, was handcuffed, and taken into custody. (Tr. at 169).

"Viewing the evidence in a light most favorable to the verdict and accepting all reasonable inferences supporting the verdict," *Bell*, 761 F.3d at 906–07, as this Court must do on appeal, does not establish that the Government proved that McKee was the shooter. The Government's case relied largely on deductive reasoning. Video showed a man shooting at someone in front of H building, running to P building, and then running inside P4. If the Government was able to show that a combination of video surveillance and officer surveillance "had eyes" on the front and back of P4 after the shooting, then the shooter had to still be in there when officers executed the search warrant. This largely makes sense, but the Government's theory breaks down on closer inspection.

Starting with the officers' surveillance, trial testimony showed that the officers did not immediately establish a perimeter around P4. (Tr. at 126). They couldn't of because of the time that it took to respond to the call and the fact that officers were not aware that P4 was involved until well after the shooting incident. There was ample time between the shooter entering P4 and the officers arriving there to surveil it for someone to run in to the unlocked apartment, (Tr. at 198), go out the back door, and jump off the balcony, which was only about 10 to 12 feet off the

31

ground. (Tr. at 124). That person could have scattered into the night like the eight people who left H6 and went off in different directions after the shooting. (Tr. at 115). So the fact that officers surveilled P4 for a period of time before McKee was arrested was inconsequential to determining that the shooter was in the apartment, as the shooter had ample time to evade them before they even arrived at the unit.

Surveillance video, however, would potentially show someone leaping from the balcony out of P4. But the first problem is that the P building was only partially covered by video. (Tr. at 116). Assuming, though, that video did cover the balcony of P4, Sandifer was watching multiple videos at a time, so his attention was divided. (Tr. at 156). Likewise, Bunch was watching multiple camera views, too. (Tr. at 276). There were times when Bunch did not watch the video in real time. He didn't stay in the video room for hours to watch it. (Tr. at 276). There were also times that he sped the video up. (Tr. at 278). Both could have missed someone jumping off P4's balcony, especially given how many cameras there were and how fast the events of that evening unfolded. Even if the officers hadn't missed anything on the video, because P building was only partially covered by video surveillance, someone could have still left the apartment without being seen on video. The Government's theory only works if the apartment was hermetically sealed, which it wasn't.

32

However, the Government's theory was bolstered by the fact that Mckee matched the physical description of the shooter in the video. Sandifer's identification of the shooter was based on "His descriptions, physical appearance and clothing description" as seen in the video. (Tr. at 120). The shooter in the video was black, had long dreads, and was wearing a long-sleeve shirt, skinny jeans. (Tr. at 44). McKee's white shoes, "right fitting" pants, and white shirt were consistent with the shooter's in the video. (Tr. at 84-85). McKee also had long dreads. (Tr. at 86). So aside from the multicolored zip-up hoodie that Mckee was wearing when he was arrested, (Tr. at 175-76), McKee appeared to match the description of the shooter.

But Sandifer testified that it was "probably" common to see individuals with jeans, white shirts, and white shoes at this complex, (Tr. at 139), the population of which was predominately black. (Tr. at 107). All eight men who fled H6 were black. (Tr. at 119). Several of them were wearing white shirts. (Tr. at 119). Several were wearing white shoes. (Tr. at 139). Sandifer had seen other men with dreadlocks at that apartment complex before. (Tr. at 139). Reynolds was also black and had short dreads. (Tr. at 131). Johnson had dreads, too, but he kept them in a French-brain on top of his head. (Tr. at 73). A black man with dreads wearing jeans, a white t-shirt, and white shoes would not be an uncommon sight at a predominately black

33

apartment complex. The evidence showed that several men at the complex were wearing such clothes and maintained such hairstyles. As such, Sandifer's identification of McKee, which was based on matching his physical appearance at the time of the arrest with what he could see on the video, should be disregarded.

The only witness who was at the scene who identified McKee as the shooter was Joy. But Ties confirmed that Mckee's trial was the very first time that Joy told anyone that the shooter was McKee. (Tr. at 354). When asked about that, Joy maintained that he had "pretty much" never been asked who shot him prior to the trial. (Tr. at 249). But that's not true at all because Detective Jacob Belay interviewed Joy about the shooting while that Joy was in the hospital on September 23, 2020 after getting hurt while fleeing from police. (Tr. at 241-42). Joy told Belay that the shooter's name was Twan. (Tr. at 242). Joy told Belay that Twan was a short black male with a chipped tooth, (Tr. at 243), but McKee does not go by "Twan" and does not have any chipped teeth. (Tr. at 244). Moreover, Joy told Belay that Twan had a black handgun with a wooden handle and a silver piece on top, (Tr. at 244), but the gun used in the shooting was an assault rifle. His testimony should be completely disregarded.

The Government never proved that McKee ever left that apartment before he was arrested. There was no surveillance video presented at trial showing McKee

34

leave P4 towards the H building prior to the shooting. In fact, even though P4 belonged to Reynolds, (Tr. at 71), Bunch found a dark-colored jacket with McKee's driver's license in it in P4, (Tr. at 278), which suggests that McKee was in P4 prior to the shooting because there would have been no way for McKee to get that jacket into the apartment if the surveillance on the apartment was as complete as the Government suggested. Moreover, Mckee was also wearing a multicolored zip-up hoodie when he was arrested, (Tr. at 175-76), not a long-sleeve shirt. (Tr. at 44). If the McKee was the shooter depicted into the video, and if the apartment was as sealed off as the Government led the jury to believe, officers would have also recovered that long-sleeve shirt that the shooter was wearing when they searched P4. But they didn't.

The Iowa City Police Department responded to Town and Campus "at least ten times a day" for various reasons. (Tr. at 36). It was one of the highest crime apartment complexes in Iowa City. (Tr. at 36). Sandifier confirmed that, based on his prior estimate, police received 3,650 calls a year from the complex. (Tr. at 107). In other words, this was a very high crime area with a lot of people matching McKee's description. The shooter could have been any number of people who went into P4, jumped off the low balcony in the back, and ran into the darkness of night like everyone else that evening. Therefore, the Government failed to prove beyond

Appellate Case: 21-3346    Page: 39    Date Filed: 01/11/2022 Entry ID: 5116161

a reasonable doubt that McKee possessed the firearm that he was convicted of possessing. Accordingly, his conviction should be reversed.

## CONCLUSION

For the reasons stated above, McKee respectfully requests that this Court reverse his conviction and sentence in 3:20-cr-00101.

Respectfully submitted,

*/s/ Nate Nieman*
Nate Nieman
Attorney at Law
329 18th St.
Rock Island, IL 61201
Telephone: (309) 623-4831
Fax: (309) 517-5843
Email: nate@niemanlaw.com
AT0012858

36

**CERTIFICATE OF FILING AND SERVICE**

I certify that on January 10, 2022, I electronically filed the foregoing brief and addendum with the Clerk of Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users were served by the CM/ECF system. The brief and addendum were scanned for viruses using Avast Security for Mac Version 13.4. I also certify that, after receipt of notice that the brief and addendum are filed, I will serve a paper copy of this brief on defendant-appellant by mailing him a copy at his last known address at Earl T. McKee #15701-030 Unit 3B, McCreary United States Penitentiary, P.O. Box 3000, Pine Knot, KY 42635. I further certify that, after receipt of notice that the brief and addendum are filed, I will transmit 10 paper copies of the brief and addendum to the Clerk of Court via UPS and 1 paper copy to the appellee via regular mail as noted below.

Respectfully submitted,

*/s/ Nate Nieman*
Nate Nieman
Attorney at Law
329 18th St.
Rock Island, IL 61201
Telephone: (309) 623-4831
Email: nate@niemanlaw.com
AT0012858

William Ripley, AUSA
U.S. Attorney's Office – SDIA

37

131 E. 4th Street, Suite 310
Davenport, IA    52801

Appellate Case: 21-3346    Page: 42    Date Filed: 01/11/2022 Entry ID: 5116161

**Fed. R. App. P. 32(a)(7) AND 8th CIR. RULE 28A(c) CERTIFICATION**

I certify that the foregoing brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7). The brief uses a proportionally spaced, 14-point Equity font. Based on a line count under Microsoft Word for Mac Version 16.47 (21031401), the brief contains 685 lines and 9,181 words, excluding the table of contents, table of authorities, any addendum, and certificates of counsel.

Respectfully submitted,

*/s/ Nate Nieman*
Nate Nieman
Attorney at Law
329 18th St.
Rock Island, IL 61201
Telephone: (309) 623-4831
Email: nate@niemanlaw.com
AT0012858

Appellate Case: 21-3346    Page: 43    Date Filed: 01/11/2022 Entry ID: 5116161